# EXHIBIT A

THIS AGREEMENT made this 4th day of August 2008, by and between Howard I. Golden (individually referred to as "Golden"), Filip Montfort (individually referred to as "Montfort"), Halifax Services Ltd ("Halifax") and Helen Nathan, (individually referred to as "Nathan"), all with an address in care of Terra Partners, Klimentska 46, Prague 1, Czech Republic (Golden, Montfort, Halifax and Nathan collectively referred to as the "Investors") and All American Oil & Gas, Inc., a U.S. Delaware corporation with an address at 310 S. St. Mary's Street, Suite 1515, San Antonio, TX 78205 hereinafter (the "Company"),

WITNESSETH:

WHEREAS, the Company invests in oil and gas ventures and seeks additional funding for its current operations by the sale of its shares, *and*

WHEREAS, the Investors are interested in purchasing shares in the Company for $4 per share but are concerned about their status as minority investors in a closely held corporation, and

WHEREAS, the Company wishes to assure the Investors about the security of their investment in regards to corporate matters, not as to the basis of the investment, and

WHEREAS, the Investors are interested in purchasing shares in the event they can receive certain assurances about their treatment as shareholders, and

WHEREAS, the parties believe it is in their best interest to unanimously agree to terms below related to the investment of the Investors

NOW THEREFORE, the parties agree to the following:

1. **Defense against forced squeeze-out:** Both the management of the Company and its Board of Directors agree to use their Best Efforts to prevent a situation where the Investors will be forced to sell their shares in the Company whether due to the entry into the Company of an institutional investor which desires the Company to force out "small" shareholders by requiring them to sell their shares or otherwise. If, despite the best efforts of the Directors and management to prevent being required to buy out small shareholders in any new agreement, and in the event management is unable to exclude the Investors from such a general forced buyout, then and in such case any attempted squeeze-out of small shareholders (and the Investors have the right to determine if a buyout offer is to be categorized as a "squeeze out") the purchase price for the shares of the Investors, without discrimination as to the size of the holding of

1

an individual Investor, will be at a price per share no less than (I) $8.00 per share for the two year period beginning August 1, 2008 (ii) $12.00 per share for the period beginning August 1, 2010 and in no event less than (a) four times net free operating cash flow, or, alternatively, (b) two times net revenues, whichever is higher.

2. **Pre-emptive rights:**  The Directors of the Company undertake to change the Company's Articles of Incorporation to create preemptive rights for shareholders in the event the Company does not conclude a transaction by June 30, 2009 with an institutional investor(s) such as Goldman Sachs.

3. **Distribution of Earnings:** The Company agrees to distribute at least 25% of its net free cash flow from its distributable earnings as a cash dividend or, alternatively, to retain the Investors Golden and Montfort on a consulting basis or other form of mutually acceptable compensation arrangement so that Golden will receive a pretax internal rate of return of 20% annually on the total invested capital in the Company of Golden and Nathan and so that Montfort will receive a pretax internal rate of return of at least 20% annually on the total amount of the capital invested in the Company by himself and by Halifax Services Ltd.

4. **Distribution of profits from a sale:**

   a. The Company agrees to distribute to its shareholders 50% of any "windfall" profits including, but not limited to, a sale of all or substantially all of the Nukern leasehold in the form of either (i) a special cash dividend or (ii) a Dutch auction share buyback. Such distribution(s) may be stair-stepped so that in the event a buyback is decided upon, a shareholder with 20,000 shares or less would be required to accept the cash buyback. In such a case the shares of Nathan would be aggregated with the shares of Golden, Montfort and Halifax would either be exempt form such a requirement or his shares would also be aggregated with the shares of Golden and Nathan for the purpose of determining the number of shares he holds. Each otherwise qualifying shareholder would have to elect to receive either a special cash dividend or, alternatively, a cash buyback on a Dutch auction basis.

   *For purposes of illustration only,* if Nukern is sold for $40 million cash the Company would pay any taxes (Federal (15%) and California state (site of the underlying asset) (~10%)) on the gain on sale less offsetting net operating losses to date. In such case, the Company's gain would be $40 million less the adjusted cost basis ($10 million) consisting of the sum of (i) the original cost of asset ($6.450 million) (ii) the capitalized costs to date ($1.550 million), and (iii) the claw back of the wellbore working interests on the five new wells already assigned to Morris-All American Exploration



2

Partners LP ($2.0 million), or $30 million. The net distributable proceeds in this example might be $21 million ($30 less notional state and federal taxes ($7.5 million) plus offsetting NOLs ($2.5 million) less debt secured by the property ($4.0 million)). Therefore, the Company would be required to distribute $10.5 million divided between a special cash dividend and the Dutch auction buyback, both to be set by the Board, and the balance would be reinvested in other AAOG assets;

b. In any sale of a major asset such as described above the Company shall have the right to structure the transaction in the most tax-advantageous manner possible including, but not limited to, the sale in a transaction structured as a tax-free exchange of shares of the Company's single purpose, wholly-owned subsidiary Kern River Holdings, Inc. ("KRH") which holds the Nukern leasehold. In the event of such a transaction in which the Company receives, for example, shares of Chevron, then such shares would in turn be distributed to the Company's shareholders as a dividend or exchanged in the Dutch auction, or subsequently sold for cash.

c. The Company promises to use it Best Efforts to distribute to the shareholders the above percentage of the "windfall profits" received as a result of the sale of a major asset, and in the event that due to highly relevant business decisions the Company votes not to distribute such profits, than and in such case, the Investors have the right and not the obligation to declare that the actions constitutes a forced buyout as set forth in para 1. above and may avail themselves of the right to be bought out at the prices and terms set forth in such paragraph.

## 5. ENTIRE AGREEMENT

a. This Agreement is the entire agreement among the parties concerning the subject matter hereof and supersedes all prior agreements concerning such subject matter, whether written or oral. It shall not be changed except by a writing signed by all of the parties hereto.

b. Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

## 6. NOTICES:

All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given if delivered by hand, by facsimile or by overnight courier service, or if mailed by registered or certified mail, return receipt requested, to a party at its address hereinabove stated or to such other address as may be designated by written notice complying as to delivery with the terms of this Section.

3

## 7. SAVINGS CLAUSE

If any provision of this Agreement or the application of any provision hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefit of the remaining portions of this Agreement to the other party or parties.

## 8. WAIVER

a. Any consent or waiver executed in writing by a party shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.

b. No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right, or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

## 9. HEADINGS

All headings and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

## 10. FURTHER ASSURANCES

The parties shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

## 11. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, but this section shall not be construed or deemed to authorize any transfer or assignment not expressly permitted under this Agreement.

## 12. COUNTERPARTS

This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

## 13. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the rules of conflicts of law.

4

### 14. LEGAL REPRESENTATION

Each Shareholder has been advised of his right to engage independent legal counsel of his own selection in connection with the negotiation, review and execution of this Agreement and had either done so or waives his right to do so.

### 15. CONFLICTING PROVISIONS

To the extent that the terms of this Agreement conflict with the bylaws and/or certificate of incorporation of the Company, the terms of this Agreement shall control and the bylaws and/or the certificate of incorporation of the Company shall either be deemed to be amended by this Agreement to the extent necessary to resolve any such conflict, or, if such change requires further corporate action, the Company commits to pass the appropriate resolutions and take the necessary actions to amend those documents of the Company not in conformance with this Agreement.

AGREED to this _4th_ day of August, 2008

_____        _____

Howard Golden                                              Helen Nathan

All American Oil & Gas, Inc.

By: _William Morris_

William Morris, President.

                                                      Halifax Services, Ltd.

_____        By:_____

Filip Montfort

THIS AGREEMENT made this 4th day of August 2008, by and between Howard I. Golden (individually referred to as "Golden"), Filip Montfort (individually referred to as "Montfort"), Halifax Services Ltd ("Halifax") and Helen Nathan, (individually referred to as "Nathan"), all with an address in care of Terra Partners, Klimentska 46, Prague 1, Czech Republic (Golden, Montfort, Halifax and Nathan collectively referred to as the "Investors") and All American Oil & Gas, Inc., a U.S. Delaware corporation with an address at 310 S. St. Mary's Street, Suite 1515, San Antonio, TX 78205 hereinafter (the "Company"),

W I T N E S S E T H:

WHEREAS, the Company invests in oil and gas ventures and seeks additional funding for its current operations by the sale of its shares, *and*

WHEREAS, the Investors are interested in purchasing shares in the Company for $4 per share but are concerned about their status as minority investors in a closely held corporation, and

WHEREAS, the Company wishes to assure the Investors about the security of their investment in regards to corporate matters, not as to the basis of the investment, and

WHEREAS, the Investors are interested in purchasing shares in the event they can receive certain assurances about their treatment as shareholders, and

WHEREAS, the parties believe it is in their best interest to unanimously agree to terms below related to the investment of the Investors

NOW THEREFORE, the parties agree to the following:

1. **Defense against forced squeeze-out:**   Both the management of the Company and its Board of Directors agree to use their Best Efforts to prevent a situation where the Investors will be forced to sell their shares in the Company whether due to the entry into the Company of an institutional investor which desires the Company to force out "small" shareholders by requiring them to sell their shares or otherwise.  If, despite the best efforts of the Directors and management to prevent being required to buy out small shareholders in any new agreement, and in the event management is unable to exclude the Investors from such a general forced buyout, then and in such case any attempted squeeze-out of small shareholders (and the Investors have the right to determine if a buyout offer is to be categorized as a "squeeze out") the purchase price for the shares of the Investors, without discrimination as to the size of the holding of

1

the period beginning August 1, 2010 and in no event less than (a) four times net free operating cash flow, or, alternatively, (b) two times net revenues, whichever is higher.

2. **Pre-emptive rights:** The Directors of the Company undertake to change the Company's Articles of Incorporation to create preemptive rights for shareholders in the event the Company does not conclude a transaction by June 30, 2009 with an institutional investor(s) such as Goldman Sachs.

3. **Distribution of Earnings:** The Company agrees to distribute at least 25% of its net free cash flow from its distributable earnings as a cash dividend or, alternatively, to retain the Investors Golden and Montfort on a consulting basis or other form of mutually acceptable compensation arrangement so that Golden will receive a pretax internal rate of return of 20% annually on the total invested capital in the Company of Golden and Nathan and so that Montfort will receive a pretax internal rate of return of at least 20% annually on the total amount of the capital invested in the Company by himself and by Halifax Services Ltd.

4. **Distribution of profits from a sale:**

   a. The Company agrees to distribute to its shareholders 50% of any "windfall" profits including, but not limited to, a sale of all or substantially all of the Nukern leasehold in the form of either (i) a special cash dividend or (ii) a Dutch auction share buyback. Such distribution(s) may be stair-stepped so that in the event a buyback is decided upon, a shareholder with 20,000 shares or less would be required to accept the cash buyback. In such a case the shares of Nathan would be aggregated with the shares of Golden, Montfort and Halifax would either be exempt form such a requirement or his shares would also be aggregated with the shares of Golden and Nathan for the purpose of determining the number of shares he holds. Each otherwise qualifying shareholder would have to elect to receive either a special cash dividend or, alternatively, a cash buyback on a Dutch auction basis.

   *For purposes of illustration only,* if Nukern is sold for $40 million cash the Company would pay any taxes (Federal (15%) and California state (site of the underlying asset) (~10%)) on the gain on sale less offsetting net operating losses to date. In such case, the Company's gain would be $40 million less the adjusted cost basis ($10 million) consisting of the sum of (i) the original cost of asset ($6.450 million) (ii) the capitalized costs to date ($1.550 million), and (iii) the claw back of the wellbore working interests on the five new wells already assigned to Morris-All American Exploration Partners LP ($2.0 million), or $30 million. The net distributable proceeds in this example might be $21 million ($30 less notional state and federal taxes ($7.5 million) plus offsetting NOLs ($2.5 million) less debt secured by the



property ($4.0 million)). Therefore, the Company would be required to distribute $10.5 million divided between a special cash dividend and the Dutch auction buyback, both to be set by the Board, and the balance would be reinvested in other AAOG assets;

b. In any sale of a major asset such as described above the Company shall have the right to structure the transaction in the most tax-advantageous manner possible including, but not limited to, the sale in a transaction structured as a tax-free exchange of shares of the Company's single purpose, wholly-owned subsidiary Kern River Holdings, Inc. ("KRH") which holds the Nukern leasehold. In the event of such a transaction in which the Company receives, for example, shares of Chevron, then such shares would in turn be distributed to the Company's shareholders as a dividend or exchanged in the Dutch auction, or subsequently sold for cash.

c. The Company promises to use it Best Efforts to distribute to the shareholders the above percentage of the "windfall profits" received as a result of the sale of a major asset, and in the event that due to highly relevant business decisions the Company votes not to distribute such profits, than and in such case, the Investors have the right and not the obligation to declare that the actions constitutes a forced buyout as set forth in para 1. above and may avail themselves of the right to be bought out at the prices and terms set forth in such paragraph.

## 5. ENTIRE AGREEMENT

a. This Agreement is the entire agreement among the parties concerning the subject matter hereof and supersedes all prior agreements concerning such subject matter, whether written or oral. It shall not be changed except by a writing signed by all of the parties hereto.

b. Except as otherwise provided herein, all rights and remedies set forth in this Agreement shall be in addition to and not exclusive of any other rights or remedies now or hereafter existing at law or in equity.

## 6. NOTICES:

All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing, and shall be deemed duly given if delivered by hand, by facsimile or by overnight courier service, or if mailed by registered or certified mail, return receipt requested, to a party at its address hereinabove stated or to such other address as may be designated by written notice complying as to delivery with the terms of this Section.

## 7. SAVINGS CLAUSE

If any provision of this Agreement or the application of any provision

3

hereof to any person or circumstances is held to be legally invalid, inoperative or unenforceable, then the remainder of this Agreement shall not be affected unless the invalid provision substantially impairs the benefit of the remaining portions of this Agreement to the other party or parties.

## 8. WAIVER

　　a. Any consent or waiver executed in writing by a party shall be binding upon such party from and after the date of execution thereof unless a later or earlier date is specified therein.

　　b. No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right, or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature.

## 9. HEADINGS

All headings and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and shall in no way define, limit, extend or describe the scope or intent of any provisions hereof.

## 10. FURTHER ASSURANCES

The parties shall execute and deliver all documents, provide all information and take or forbear from all such action as may reasonably be necessary or appropriate to achieve the purposes set forth in this Agreement.

## 11. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, but this section shall not be construed or deemed to authorize any transfer or assignment not expressly permitted under this Agreement.

## 12. COUNTERPARTS

This Agreement may be executed in counterparts and each such counterpart, when taken together, shall constitute a single and binding agreement.

## 13. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the rules of conflicts of law.

## 14. LEGAL REPRESENTATION

Each Shareholder has been advised of his right to engage independent legal counsel of his own selection in connection with the negotiation, review and

4

execution of this Agreement and had either done so or waives his right to do so.

## 15. CONFLICTING PROVISIONS

To the extent that the terms of this Agreement conflict with the bylaws and/or certificate of incorporation of the Company, the terms of this Agreement shall control and the bylaws and/or the certificate of incorporation of the Company shall either be deemed to be amended by this Agreement to the extent necessary to resolve any such conflict, or, if such change requires further corporate action, the Company commits to pass the appropriate resolutions and take the necessary actions to amend those documents of the Company not in conformance with this Agreement.

AGREED to this ___ day of August, 2008

_____        _____
Howard Golden                                                Helen Nathan

All American Oil & Gas, Inc.

By: _____

William Morris, President.

_____        Halifax Services, Ltd.
Filip Montfort                                     By: _____

5